WENDT *v.* ISMERT-HINCKE MILLING COMPANY.

Opinion delivered February 17, 1913.

1. SALE OF CHATTELS — BREACH — RECESSION — EVIDENCE. — Defendant agreed to purchase flour from plaintiff at a certain price, and before the date of shipment, A wrote to plaintiff that it had acquired defendant's business and could not use the flour. Plaintiff then sold the flour to A at a price less than the contract with defendant. *Held,* when it appeared that defendant acquiesced in A's letter to plaintiff in order to get the flour at a lower price, the letter was admissible and was evidence of a renunciation of the contract by defendant. (Page 112.)

2: SALE OF CHATTELS—BREACH—TENDER.—When the vendee in an executory contract for sale of chattels, rescinds his contract, and the vendor is without fault, the vendor may maintain an action against the vendee without making a tender of the chattels to the vendee. (Page 114.)

Appeal from Jackson Circuit Court; *R. E. Jeffery,* Judge; affirmed.

*Jones & Campbell* and *Sam Frauenthal,* for appellant.

1. Before appellee could maintain this action, it devolved upon it to show a performance, or an offer to perform, on its part, or such an absolute and unqualified repudiation of the contract by appellant before the time for delivery as to render a performance or tender to perform unnecessary. 4 Selden, 512; 2 Mechem on Sales, § 1109; 56 N. Y. 638; 16 Fed. 168; 30 Cal. 486; 40 Ill. 368; 35 Cyc. 164.

The doctrine that renunciation of an executory contract, performance of which is not yet due, will be treated as a breach entitling the injured party to bring suit at once, a principle recognized by English authorities by the United States Supreme Court in 178 U. S. 1, and this court in the Kirschman case, 92 Ark. 111, is based upon the occurrence of two things: First, there must be a distinct, unequivocal and absolute refusal to perform by one party; and, second, such refusal must be treated and acted upon as such by the other party. A mere expression of unwillingness to perform or negotiations seeking an alteration or rescision is not sufficient. 2 Benjamin on Sales, § 860; 15 Wall. 36; 117 U. S, 490; 2 El. & Br. 678; 2 Mechem on Sales, § 1087; 9 Cyc. 637.

2. The contention that the letter of the Valley Commission Company was such a repudiation of the contract as to constitute a breach is not correct because there is nothing to show that appellant authorized the writing of a letter refusing to accept the flour absolutely and because the letter itself does not purport to be either a repudiation of the contract or a refusal by Wendt to receive the flour.

*Jno. W. & Jos. M. Stayton,* for appellee.

This is a typical case for the application of the rule that "where one, by word or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his condition, the former is precluded from averring against the latter a different state of things as existing." 29 Ark. 218; 35 Ark. 376; *Id.* 293.

SMITH, J. This suit was brought by appellee to recover damages for the alleged breach of an executory contract for the sale of two carloads of flour. The complaint alleged that on the 29th day of September, 1910, the appellant made two written orders for the purchase of flour from it. One of said orders was for eighty barrels of I. H. flour at $5.15 and eighty barrels of Thunderbolt flour at $4.95, to be shipped to appellant at Newport, Ark., on March 1, following. The other order is for

eighty barrels of I. H. flour at $5.25 and eighty barrels at $5.05 to be shipped on May 1 following, and in both of said orders it is stipulated that an allowance of fifteen cents per barrel should be made for sacks returned to the mill. The order was changed to all Thunderbolt and as changed was accepted by appellee. That on March 15, appellant notified appellee, or caused it to be notified, that none of the flour would be received and declined to receive the same, and that, at the time of the refusal the market for flour had declined and appellee sold same on March 17, 1911, to the Valley Commission Company at the price of $4.50 per barrel, which was the best price obtainable for the flour at that time, and that it had thereby sustained a loss of $160 upon which amount there was a credit of $24 for flour sacks, returned by appellant, and judgment was prayed for the balance of $136.

In his answer, appellee denied all the material allegations of the complaint, and denied that he had notified appellee, or had caused it to be notified that none of said flour would be received, or that he had declined to receive it, but he alleged that before the day of delivery, appellee failed to perform the contract on its part by declining to ship said flour and by selling it to another party.

The cause was submitted to the court, sitting as a jury, and there was a finding and judgment for appellee for the amount sued for. The cause was heard on the deposition of the secretary and manager of the milling company and the oral evidence of the manager of the Valley Commission Company. The appellant did not testify and made no explanation of the correspondence exhibited in evidence. Appellee's manager testified as to the receipt and acceptance of appellant's offer and as to the decline in price and that the flour was sold at the highest market price obtainable at the time of the alleged repudiation of the contract. He exhibited the correspondence, which constituted the contract of purchase and evidenced its breach, if there was a breach. The order for the flour was as follows:

September 29, 1910.

Ismert-Hincke Mfg. Co., Kansas City, Mo.   Ship to A.
    Wendt at Newport, Ark.   How ship, R. I.   When,
    March 1.   Terms, s/o.

80 bbls. I. H. flour............................$5.15
80 bbls. Thunderbolt flour....................... 4.95
98 lbs. cotton.

Allowance of 15 cents per barrel for sacks returned
to mill.   Absolutely guaranteed to give satisfaction.

A. Wendt.

This order was changed to all Thunderbolt by the
following letter:

"Newport, Ark., March 8, 1911.

The Ismert-Hincke Milling Company, Kansas City, Mo.

Gentlemen:   I have shipped you 325 empty sacks
by express prepaid, and you may ship the flour some time
the middle of this month.   You may send the draft to
the Farmers Bank of Newport, Ark.   If possible, please
do not ship the freshest flour.

Yours truly,

City Bakery.

Per A. Wendt.

Please ship all Thunderbolt flour.

A. W."

The appellee agreed to this change in the order
above referred to, and proceeded to pack the flour in the
sacks which had been forwarded to it by the appellant,
but, before it was shipped, received the following letter:

"Newport, Ark., February 19, 1911.

The Ismert-Hincke Mill & Elevator Company, Kansas
    City, Mo.

Gentlemen:   I am in communication with a gentle-
man from Illinois who wants to buy my place of busi-
ness, and I do not know whether he would be willing to
handle your flour or not.   We have still enough flour on
hand to do us another month or more, and as there is
more than one shop here now (which, by the way, gives
us a good deal of trouble) we do not need near as much
flour as we used to use, and, as I say, will be glad if I

can get rid of the place. I just let you know; you might unknowingly ship that carload off and have no taker for same. I will try to get him to use your flour, although he already told me that I am paying too much for my flour. He has the agency for a certain brand which he claims he may continue to use. Hoping that this little information will not interfere with your plans, I am,

Yours truly,

A. Wendt.''

In answer to this letter, appellee wrote the following letter:

"February 21, 1911.

Mr. A. Wendt, Newport, Ark.

Dear Sir: We have yours of the 19th, and note contents. In reply will say that regardless of whether you sell your bakery or not, there is a car of flour due you on our books, which of course we expect you to take out, etc.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Yours very truly,

Ismert-Hincke Milling Company.

Sales Manager.''

Appellant wrote the following letter:

"Newport, Ark., March 1, 1911.

The Ismert-Hincke Milling Company, Kansas City, Mo.

Gentlemen: I have several hundred empty flour sacks (98) and as my successor is not going to take possession before April 1, 1911, I will need some more flour before that time. The contract calls for fifteen cents allowance on each barrel if sacks are furnished, and I will ship 320 sacks to you to be refilled with the same flour. The last flour was all right, and if this flour should not come up to the grade of the last flour I will send it back to you, as it was absolutely guaranteed. Let me know at once if this will be satisfactory.

Yours truly,

A. Wendt.''

And the appellee replied as follows:

"March 4, 1911.

Mr. A. Wendt, Newport, Ark.

Dear Sir: We have yours of the 1st and note contents. Upon receipt of your empty sacks we will ship you a car of flour as ordered. You need have no fear whatever of this flour not coming up to former shipments, as we test every barrel that we ship, and we assure you we will be very careful in this instance. We will of course allow you fifteen cents per barrel for your empty sacks.

Yours very truly,
Ismert-Hincke Milling Company.
Sales Manager."

These sacks were later received by appellee and were filled and ready to load in the cars for shipment to the defendant when appellee received a letter from the Valley Commission Company of Newport, Ark., as follows:

"Newport, Ark., March 15, 1911.

Ismert-Hincke Milling Company, Kansas City, Mo.

Dear Sir: We have the City Bakery from Mr. Wendt, former manager, and wish to say that the contract on flour that you insist on him taking out we can not use. Therefore any shipment you make to the City Bakery will be turned down by us. Trusting this matter has your immediate attention, we are,

Yours very truly,
Valley Commission Company.

D/P.

P. S.—If you can meet a price of $4.50 (this is price of Caldwell Milling Company's U. S.) per barrel on your Thunderbolt we might let both shipments come on at this price.

V. C. Co."

Defendant at the time objected to this letter on the ground that it was not shown that it was authorized by appellant and saved its exception to the action of the court in overruling its objection. The flour was sold to the Valley Commission Company for $4.50 per barrel.

It is earnestly insisted that but for the letter of the Valley Commission Company of date of March 15, there is not sufficient evidence that this company had authority to cancel the contract, and that appellee was not warranted in the assumption that this letter accomplished that purpose. The evidence of the manager of the commission company in connection with the correspondence herein set out, is sufficient to warrant the submission of that question to the jury, or to the court, sitting as a jury. The following questions propounded to and answers given by Pate, the commission company's manager, are relevant and important and make the letter objected to competent under the circumstances:

Q. Now, Mr. Pate, state to the court how that letter happened to be written.

A. We were figuring on buying out a competitor of Mr. Wendt's, in order to get stock in his concern; that is, to get to sell him the flour he used; and he told us that he had this flour coming from the Ismert-Hincke Milling Company, and we did not get in on the proposition, and we priced the flour and told him we wouldn't use it.

\* \* \* \* \* \* \* \*

Q. What authority did you have for writing it, if any?

A. Well, I didn't have any authority except if I was going to get the place I wanted to sell him the flour.

Q. When you told him that, what did he say or do?

A. I don't remember what he said.

Q. How did you happen to write this letter?

A. I figured on getting a profit on the flour.

Q. Did anybody suggest to you to write it?

A. Nothing except the profit on the flour suggested it. I told him (Wendt) that we could not use the flour at that price.

Q. Well, what did he say?

A. He said he didn't know how he was going to get around using it, I think, and I told him that I would not use it at that price. I don't remember whether he was there when I wrote the letter or not. I figured out

that I would write them a letter to see what I could do with it.

Q.   I will ask you whether or not Mr. Wendt suggested this method to you of getting the price down?

A.   No; he didn't suggest it to me.

Q.   What suggestion did he (Wendt) make?

A.   Well, he told me that I might write them and see what I could do.

Q.   And get the price lower?

A.   Well, that was for my benefit.

And on cross examination he testified as follows:

Q.   And he (Wendt) never authorized you to notify them that he would cancel the order, did he?

A.   No; he just told me to go ahead, and if I could get it cheaper to do so; that was up to me if I was going to get an interest in it.

Q.   That was on the theory that you were taking it over and getting an interest in it?

A.   Yes, sir.

Q.   You didn't consummate that transaction?

A.   No.

Q.   You didn't consummate the deal of taking over the bakery as you contemplated doing at that time, did you?

A.   No, sir.

Q.   He says, You go ahead and get it cheaper if you can?

A.   Well, I guess so.   I guess you would call it that. I won't say that he suggested it, though; it might have been a suggestion of mine.

Q.   He assented to it, didn't he?

A.   Yes.

Q.   He endorsed whatever you did?

A.   Yes.

Q.   Now he (Wendt) endorsed whatever you did in the matter, did he?

A.   Yes, sir.

Q.   I do not mean that he told you to write this letter, or that he dictated the letter, or anything about that

but he authorized you to do what you did, is that right?

A.    Yes; it was all right with him for me to go ahead.

Q.    He (Wendt) assented to and endorsed it?

A.    Yes, sir.

Q.    And you made that offer in this letter, $4.50 per barrel?

A.    Yes, sir.

Q.    For two cars of Thunderbolt?

A.    For the two cars.

Q.    Was that offer accepted by them?

A.    Yes, sir.

Q.    Was the flour shipped?

A.    Yes, sir.

Q.    What became of it?

A.    I sold it to the City Bakery.

Q.    Sold it to Mr. Wendt, did you?

A.    Yes, sir.

Q.    He got the flour after all?

A.    Yes, sir.

Q.    At a less price than the contract price?

A.    Yes, sir.

It is further contended that before the date of performance, appellee put it beyond its power to perform the contract by selling the very flour which appellant ordered, and that before it could maintain this action it devolved upon it to show a performance upon its part, or an offer to perform, or such an absolute and unqualified repudiation of the contract by the appellant, before the day of delivery, as to render unnecessary a performance or tender to perform. We have just shown that the evidence set out was sufficient to sustain the finding that appellant had repudiated the contract, and that finding is as conclusive as the verdict of a jury. *Williams v. Board of Directors*, 100 Ark. 166.

There are cases in which it has been held that the repudiation of an executory contract before the time for performance did not give to the other party an immediate right of action and the cases so holding are re-

viewed in the case of *Stanford* v. *Magill*, 38 L. R. A. 760.
But other authorities hold that though the performance
of an executory contract is not yet due, a renunciation
thereof will be treated as a complete breach, entitling the
injured party to bring an action at once, and, in an able
opinion by Judge FRAUENTHAL, this court adopted this
latter doctrine. *Kirchman* v. *Tuffli Bros.*, 92 Ark. 111.

We conclude, therefore, that the judgment is sup-
ported by evidence which is legally sufficient, and that the
court did not err in the admission and consideration of
the letter written by Pate for the Valley Commission
Company, and the judgment is accordingly affirmed.